We'll hear now from the parties in United States v. Rawlins. May it please the Court, my name is Stephen Brill from the law firm of Sullivan Brill and I along with James Healy filed the brief here in making this particular argument. The crux of our argument, Your Honors, is that this appeal boils down to the fact that the lower court abused its discretion when it erroneously made evidentiary rulings that unfairly diminished the credibility of our client, Mr. Rawlins. That shielded the government's main witness from an attack on his credibility, which ultimately violated Mr. Rawlins' due process and denied him his right to... Well, it was an attack. It was one line of attack. His credibility was not, didn't go unchallenged. Well, right, Your Honor. I mean, obviously there was cross-examination. He wanted to get in the fact that he had an affair and, you know, accompanied by the economy of the truth that often accompanies such matters. Yes, Your Honor. So, I mean, obviously Mr. Sharpe, who we're referring to as the government's main witness, was cross-examined. So to that extent, his credibility was explored and examined by the trial attorney who engaged in that. But that should not preclude defense from being able to cross-examine a witness like that of all factors that are relevant to his credibility. Necessarily. I mean, we routinely say that impeachment that's cumulative or on collateral matters doesn't deprive a defendant of a fair trial. What was the inability to question him about a marital affair? How did that deprive you of a fair trial here? Well, Your Honor, I mean, you know, the idea of the marital impropriety is essentially, you know, evidence of Mr. Sharpe's deceit. But I do want to make clear that the marital impropriety alone does not end the discussion. So if I understand Your Honor correctly— You started out by saying that you were denied the opportunity to impeach the government's lead witness. And what the questions you've heard so far suggest is that you were only denied the opportunity to ask him about a marital affair, not about a whole range of other conduct and statements, et cetera, that allowed you to argue credibility. So I guess what we're looking for is this is the kind of matter that courts routinely place limits on. Why shouldn't the court have done so here? Because in this case we're talking about a lot more than just the marital impropriety, that the marital impropriety was essentially the inception of our examination. But what the marital impropriety — what was underneath that marital impropriety went to the heart of the particular case. The case, really what it boils down to, despite the fact that it took several weeks to try, was that this is essentially a case of he said, he said, which Mr. Rawlins is saying that he had the permission and authority to acquire the funds that Mr. Sharpe is saying were stolen. Mr. Sharpe is obviously the individual we're talking about. The impropriety here is essentially the fact that Mr. Sharpe had this particular affair. Mr. Rawlins was involved very deeply in brokering a deal that resulted from the affair, that there was now a company at issue that had to now be part of a marital divorce agreement. You were allowed to elicit that there was a divorce, that there was that motivation. You were allowed to elicit all of that. What you weren't allowed to elicit was what we will call the tawdry details. Well, Your Honor, I mean, with all due respect, you know, cross-examination in many, many times gets out of tawdry details and that. They're relevant. Yeah, understood. And the relevance here, Your Honor, is that essentially if you don't look at it as the only base of the cross-examination, but that it is essentially the inception of the deceit by Mr. Sharpe that he. The problem with marital affairs are that the jury is just as likely to, rather than focus on any deceits that might have occurred, some of the jurors might just say, well, I don't like anybody who engages in a marital affair, period, and therefore, you know, pocks on that witness for that reason. And that's not credibility. That's just a bias. Appealing to a bias. And a court exercising its discretion is perfectly capable of saying, yeah, well, that's pretty far afield. We're not going to get into that. And I understand, Your Honor, and I think those are good points, and I think that's exactly why maybe a curative instruction, you know, is necessary perhaps in that situation. But the idea is that in order to understand what followed from the marital impropriety and the discussions of the divorce settlement, how it pertained directly with the company at issue, how Mr. Sharpe devalued the company in order to derive a favorable benefit from the divorce. Why didn't, knowing that there was a divorce, that there was a marital breakup, and I think you even got to elicit that then he got remarried. He did. Which the jury could, you know, draw its own inferences about. Why didn't that give you everything you needed for purposes of motivation here? Well, Your Honor, like I said, I mean, I think that in order to credit the need to bring out what led to the divorce, that, I mean, assuming we all agree that the unfaithful What would it have mattered if it was his wife who was unfaithful, he was unfaithful, it was a mutual understanding? What did it matter? The motivation for the financial transaction was the divorce, and that you got out. I guess we'd all have to agree, Your Honor, that marital impropriety, how it began in this particular case was essentially that he was unfaithful and he had an affair, and that that deceit and that lying to his particular, or his violation of the marital oath in that particular situation, then culminated into this divorce settlement, and as a result, and part and parcel of the divorce settlement, Mr. Sharpe continued that deceit and continued lying about the company with the help of Mr. Rawlins. So I think it would be unfair, Your Honor, if the court said we're just going to allow you to talk about the divorce and not talk about what led into that, only because the whole crux of the cross-examinations or the attempt made to cross-examine Mr. Sharpe was based on the idea that he was lying, and he was lying about his relationship with Mr. Rawlins and lying about the permission and authority that he says he didn't give Mr. Rawlins. And to understand Mr. Sharpe as a whole, we believe that the affair was relevant, even though I understand, Your Honor, to say that in and of itself it may not be, and it's tawdry and it's prejudicial, as Your Honor has said. It helped tell the narrative as to why Mr. Sharpe was lying, which was the critical aspect of the defense. But the errors, in our opinion, Your Honor, didn't stop there. So I imagine that if it did, I would concede that we'd have an extremely difficult chance to succeed at this stage. But we believe that the Court continued to make erroneous rulings that was an abuse of her discretion. We mentioned the lack of ability by lead counsel to go into a civil suit that was filed by Mr. Rawlins against Mr. Sharpe and denying us the opportunity to get into it. That was denied on the basis of a lack of a foundation as to whether or not Sharpe actually reviewed the answer. Isn't that correct? Well, that's right. A representation was made by the government, and with all due respect to the government, their representation was that Mr. Sharpe did not review it. And I think the Court, as Your Honor correctly points out, relied on that fact and said, so therefore we're not going to allow you to get into it. Our understanding, based on our own investigation, was that that was hard to understand and hard to comprehend that a hundred percent sole owner of a company, when they are sued, and then an answer follows in that lawsuit, does not review the answer or sign off on it or speak to their attorneys about it. So it was our feeling that we at least needed the ability to, the latitude to cross-examine this particular witness about that answer and at least get to the bottom of whether or not he did review it or did sign off on it. And if he didn't, you know, what did he know about it or how could he not? And so the decision basically cut the knees out from under us before we even were able to get a chance to cross-examine him about statements that he made. And again, this all plays into the idea that these were statements made by the main witness who was alleging that Mr. Rollins did not have permission and authority to obtain these funds. I'm very much into my time now. Thank you so much. Thank you. May it please the Court, my name is Assistant United States Attorney Andrew DeFilippis and I represented the government in the District Court. Your Honors, very briefly on the issue of Mr. Sharpe's extramarital affair, the affair itself was a collateral matter which courts have said has, quote, meager probative value in assessing someone's credibility. What really was relevant to the trial and to the issues before the trier of fact in the case was the divorce and Mr. Rollins' role as a hired mediator between Mr. Sharpe and his ex-wife. And that subject, those subjects were subject to full examination on direct examination and cross-examination and gave the jury a full opportunity to hear Mr. Sharpe's version of the facts, Mr. Rollins' version of the facts, and to weigh the credibility of those witnesses. Was it also before the jury that he remarried within a short period of time? It was, Your Honor. In fact, Mr. Rollins himself testified that shortly after Mr. Sharpe finalized his divorce, I believe it was within a period of a month or so, he married someone else from within the company. And so a juror certainly could have surmised that there was an affair, although there was no direct testimony to that effect. And so for all of those reasons, because the jury had an extensive record before it, including numerous defense character witnesses who testified to Mr. Sharpe's credibility, including emails that corroborated Mr. Sharpe's accounting of events, and the testimony of another CEO for a related company in Florida who was closely involved in the events of both companies, for all those reasons, the jury had an extensive record on which to evaluate Mr. Sharpe's credibility. And the absence of testimony on this prejudicial and potentially inflammatory issue would not have affected their view of Mr. Sharpe's credibility. Is the evidence independent of Sharpe as to Rollins' defense, that addressed Rollins' defense that somehow Sharpe authorized him to compensate himself in this manner? Your Honor, other than Mr. Sharpe's testimony, there were several other witnesses who corroborated the fact that these withdrawals of company funds were neither authorized by the company, nor known to Mr. Sharpe or others within the company. For example, the company's general counsel, Allison Harris, testified to that effect. The company's bookkeeper, Renee Haywood, testified as to the means and methods that Mr. Rollins covertly withdrew funds. The testimony of Dr. Gass I take it that there was also testimony that this was not done open and notoriously in certain respects, that there was concealment involved here. That's correct, Your Honor. There was testimony about a particular bank account that Mr. Rollins covertly activated without the knowledge of the CEO or others at the company, and used it to siphon funds out of the company. And perhaps most importantly, there were emails from Mr. Sharpe to Mr. Rollins in which Mr. Sharpe, once there was some whiff, some awareness that he might be stealing funds, instructed him to stop, and subsequent bank withdrawals that showed he did not. And so, in fact— And indeed, weren't there situations where Rollins admitted, having taken certain money improperly, as long as it was going to stay in-house and they could resolve it that way? There were, Your Honor, and there was one particular— That's correct, Your Honor, and there was one particular instance that multiple witnesses testified about at trial in which Mr. Rollins was essentially caught in the act, spending company money on personal expenses, and it was discussed, and he promised he would never do it again. So, again, a combination of witness testimony, documentary evidence, email evidence, and, in fact, the sheer scale of Mr. Rollins' withdrawals, which the credit card records showed were used for personal expenses, all of that belied his assertion that these were authorized withdrawals. And, in fact, in addressing the sentencing enhancement for obstruction, Judge Nathan found quite compelling the gulf or the gap between the accounting reflected in the emails and the accounting that Mr. Rollins gave on the stand. Judge Nathan also properly exercised her discretion in ruling on a number of evidentiary matters relating to other victims of Mr. Rollins' fraud, and we lay out in our brief why in each factual circumstance that was the case. These were all matters that fell well within the judge's discretion and that fell well within the standard for direct evidence. For example, the— Were these admitted as independent, separate bad acts, or were they admitted as part of the scheme? They were admitted as part of the scheme as direct evidence, Your Honor, but with an instruction before the jury during the charge, the typical similar acts evidence, that if the jury were to find that particular acts were similar to the charge conduct but not a part of it, it recited the standard jury instruction on that point. And so the government submits that there could have been no prejudice, regardless of which bucket the jury perceived them to be in. Your Honor, unless the court has further questions, I think the government would rest on its brief. Will you reserve some time? Yeah, I did, and I went into it. I apologize, Your Honors. I'll be brief. I will just address Judge Walker's questions with respect to other corroborating evidence, which I understand, Your Honor, to say if there was, then, you know, Mr. Sharpe's permission or lack of permission may be less important if there was other corroborating evidence. But I think that the court should look from Mr. Sharpe and view it as it all flowing from Mr. Sharpe. And what I mean by that is that the theory of defense was always that Sharpe gave Mr. Rollins complete authority to do what he did. And on top of that, because there was this overt criticism of Mr. Rollins by Mr. Sharpe to the rest of the company, that this was, in the defendant's point of view, a way for Mr. Sharpe to keep up appearances to show that he was objecting to Mr. Rollins' behavior, showing his company that he disapproved of his conduct, wanted him to stop, but that an underlying understanding between Mr. Sharpe and Mr. Rollins was that, nevertheless, he had the authority and the permission to do that. Where was the evidence from Mr. Rollins to the effect that he objected at the time that they blew the whistle on him and said, wait a minute, everything I did was authorized? Well, actually, there is a critical piece of evidence with respect to that, Your Honor, and that's the lawsuit that was filed against Prime Health following this particular alleged conspiracy. And that's actually part of – I think they have a lawsuit later on. Yeah. But when it's raised, instead, my understanding is that he went back and he accepted the fact that he had improperly taken money and owed it and would pay it back, right? Well, I'm not – I mean, there was, as I recall, something up to $2 million worth that he didn't object to their claiming that this was money that he had improperly received. I'm not – Your Honor, I'm sorry to disagree. I'm not sure there was ever any indication from Mr. Rollins that it was ever improperly received by Mr. Rollins at any point. Like I said, in fact, that his lawsuit that he ultimately filed against Prime Health was that this was part of an oral contract that he had with Mr. Sharp and that any compensation that he received was authorized and permitted. So I'm not familiar with any occurrence where Mr. Rollins agreed that particular – I'm not saying he agreed. I'm saying he didn't – his course of conduct was to restore money back to the company, at least initially, as long as it was kept in-house and they were going to come up with that. And he would agree to cooperate and he'd look for other things that might have been mistakes and so forth, and he'd correct it on that basis. So, Your Honor, if that's correct, I would argue that that's not mutually exclusive with the idea that from the get-go that there was an agreement between Mr. Sharp and Mr. Rollins that the bulk of the money, the bulk of the money at least that the government is claiming was illegally gotten, was permissible and authorized by Mr. Sharp. So I – You're not making a sufficiency challenge, right? So where do you want us to go with this? Well, Your Honor, so I mean – I'm sorry to interrupt. Ultimately, Your Honor, it's our submission that the cumulative effect of Judge Nathan's evidentiary rulings – I guess my point is the cumulative effect, individual effect, the evidence was overwhelming as to what he did and that it wouldn't have made any difference. Well, obviously, Your Honor, if I would be so bold to put words in your mouth, you're claiming that essentially it's a harmless – Exactly. Yeah, and so our position, Your Honor, is that when you have the breadth of – assuming Your Honor agreed with each of our arguments that each of the rulings by Judge Nathan were improper and erroneous, we would respectfully disagree and argue that that could never be harmless, especially if Your Honor has agreed with the argument that we needed latitude in order to cross-examine Mr. Sharp to establish the permission and the authority of Mr. Rawlins taking that particular money. And I'll just end by saying that if we were able to explore that and also at the same time have Judge Nathan not allow several instances of prior bad acts or direct evidence that occurred after the conspiracy, that it's very possible that the jury could have viewed this a close call and had some type of reasonable doubt or more that the jury felt that Mr. Sharp was lying and that Mr. Rawlins was not guilty because the government didn't provide sufficient evidence. So thank you very much for listening. We'll take the matter under advisement. That's the last case being argued today. The remaining two cases on our calendar are submitted. We stand adjourned.